```
             UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
                   WESTERN DIVISION
```

**CIVIL ACTION NO. 1:15cv00246-WOB-KLL**

**WESTERN-SOUTHERN LIFE**
**ASSURANCE CO.**                                        **PLAINTIFF**

**VS.**                  **MEMORANDUM OPINION AND ORDER**

**PAMELA JO CROPENBAKER, ET AL**                        **DEFENDANTS**

This is an action involving a dispute over life insurance proceeds between a decedent's estate and his former spouse.

This matter is currently before the Court on the defendants' cross motions for summary judgment (Docs. 25, 26), the parties' respective responses (Docs. 27, 29), and the parties' respective replies (Docs. 30, Doc. 31).

The Court previously heard oral argument on these motions and took the matter under submission. (Doc. 34) Having further reviewed these motions, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

On December 12, 1991, Decedent Steven Strasinger ("Steven") purchased a life insurance policy with a benefit of $100,000 from Western-Southern Life Assurance Company ("Western-Southern"). (Doc. 29, Exh. 1). On August 25, 2001, Steven married Pamela Jo Cropenbaker ("Pamela Jo") and designated her as the primary

beneficiary of the Policy.[1] When Steven married Pamela Jo, he also had two children from a previous relationship.

On May 31, 2004, Steven was in a motorcycle accident and suffered "damage and bleeding to his brain." (Affidavit of Larry Strasinger ¶ 13) (Doc. 28, Exh. 1).[2] Larry states that after the accident, Steven was never the same, specifically, that "[h]e could not focus on multitasks, and [Larry and their mother] needed to assist him with his affairs for the remainder of his life." *Id*. ¶ 18. Additionally, Steven received Social Security Disability benefits and lived with his mother, needing her assistance. *Id*. ¶¶ 19-21.

Larry also states in his affidavit that:

> 22. To the best of my knowledge, [Decedent] had no friendly, on-going relationship with [Pamela Jo].
>
> 23. In fact, [Decedent] had expressed nothing but negative feelings about [Pamela Jo] for the remainder of his life.
>
> 24. To the best of my knowledge, the life insurance bills never reminded [Decedent] who was listed as the beneficiary on the policy.

*Id*. ¶¶ 22-24.

---

[1] Paula Reed was the alternate beneficiary of the policy. However, because she preceded Steven in death, the only living beneficiary is Pamela Jo.

[2] Defendant Larry Strasinger ("Larry") is Steven's brother and the administrator of his estate.

On April 24, 2006, the Campbell County Family Court entered a divorce decree that terminated Steven and Pamela Jo's marriage.[3] (Doc. 1-1). In a separation agreement filed concurrently with the divorce decree, the parties agreed that Steven would "have all of his bank accounts and insurance policies." *Id.* at 6. The Separation Agreement also contained a comprehensive mutual release clause.[4] *Id.* at 7.

Steven died on November 10, 2014. (Doc. 29, Exh. 4). At the time of his death, the Policy was in full effect. It is undisputed that at no time after the divorce did Steven designate anyone other than Pamela Jo as the primary beneficiary of the Policy.

After Steven's death, Western-Southern received claims by both Pamela Jo and Steven's estate for the proceeds of the policy.

---

[3] The Findings of Fact section of the divorce decree also states that the parties had "lived separate and apart from each other since March 7, 2004." (Doc. 1-1 at 1).

[4] Specifically, the mutual release clause states:

> Each party does hereby release and discharge the other from any and all claims, demands, liabilities, obligations, damages, actions, including but not limited to any and all claims for past, present and future maintenance, dower, curtesy, descent and distribution and any and all other claims arising out of the marriage or otherwise, but excepting from said releases the obligations contained in the herein agreement.

(Doc. 1-1 at 7).

3

Western-Southern thus filed a complaint for interpleader in this Court on April 15, 2015. (Doc. 1). The Court subsequently granted Western-Southern's motion for interpleader, allowed it to deposit into the Court the balance of the policy proceeds (after allowing its fees and costs), and dismissed Western-Southern as a party to this action. (Doc. 19).

*Analysis*

Pamela Jo, as the primary beneficiary of the policy at the time of Decedent's death, argues that she is entitled to the policy proceeds because the Separation Agreement failed to specifically state that she was divested of her beneficiary expectancy. Under Kentucky case law, she is correct.

In Kentucky, it has long been held that "divorce alone does not disturb a former spouse's status as an insurance policy beneficiary." *Hughes v. Scholl*, 900 S.W.2d 606, 607 (Ky. 1995) (citing *Ping v. Denton*, 562 S.W.2d 314 (Ky. 1978)). However, the Supreme Court of Kentucky has also clarified that this does not limit "the power of divorcing parties to provide for termination of either spouse's beneficiary expectancy in a property settlement agreement." *Hughes*, 900 S.W.2d at 607. In other words, parties to a divorce may waive any beneficiary expectancy to each other's life insurance proceeds by including divestiture language to that effect in a separation agreement. Importantly though, Kentucky's highest court has held that such "divestiture language should be

4

**clear and unambiguous**." *Id*. at 608 n.2 (emphasis added). Finally, "a general waiver of any interest in the property of the other spouse is insufficient to destroy a beneficiary's right to receive insurance policy proceeds." *Id*.

Turning to the Separation Agreement in this case, the Estate argues that the language contained therein is sufficiently clear and unambiguous to sever Pamela Jo's right to Steven's insurance policies. Specifically, the Estate points to two sections of the Separation Agreement, one being the mutual release clause of the agreement contained in Section 4.1. *See* Doc. 1-1 at 7. However, because this clause is the exact type of "general waiver" clause that the *Hughes* court explicitly held was insufficient to divest a former spouse's beneficiary expectancy, this argument fails.

The Estate also points to Section 2.9 of the Separation Agreement, which states that "[t]he Husband will have all of his bank accounts and insurance policies." (Doc. 1-1 at 6). While at first glance this language may seem sufficient to divest Pamela Jo of her beneficiary expectancy under the policy, Kentucky courts are of a different view. Specifically, Section 2.9 of the Separation Agreement, in stating that Steven will "have all of his . . . insurance policies," only addresses Decedent's ownership of the Policy as opposed to Pamela Jo's beneficiary expectancy in its proceeds.

5

Illustrative of this distinction is the case of *Stull v. McGill*, wherein the Kentucky Court of Appeals dealt with facts directly on point with the case at hand. No. 2010-CA-001565-MR, 2011 WL 4117891 (Ky. Ct. App. Sept. 16, 2011). In *Stull*, a divorcing couple entered into a separation agreement that stated "[the husband] shall have as his own free and clear of any claim of [the wife], the following: . . . (e) All life insurance policies on his life, if any." *Id.* at *1. Three years later when the husband died, his estate filed a complaint against the ex-wife, alleging among other things, that the ex-wife had breached the separation agreement by claiming and receiving the policy proceeds. *Id.* at *2. The trial court agreed and granted summary judgment to the estate. *Id.*

On appeal, the ex-wife argued that the trial court's judgment was in error, and maintained that "the agreement failed to divest her of any beneficiary expectancy because the language of the agreement did not specifically state so." *Id.* The appellate court agreed, and it reversed and remanded the case with instructions for the lower court to enter judgment in favor of the ex-wife. *Id.* at *2-3. In doing so, the court explained:

> The agreement between Holly and Kenneth does not specifically address the right to beneficiary expectancy; it only addresses ownership over the policy itself. **This distinction is pivotal**. As owner of the policy, Kenneth retained the discretion to continue the policy, cancel it, increase it,

6

> change the beneficiary, or even cash it. He chose not to make any changes.

*Id.* at *2 (emphasis added).

As in *Stull*, Section 2.9 of the Separation Agreement here addresses only Steven's ownership of the policy itself; it does not specifically address Pamela Jo's right to beneficiary expectancy. Additionally, like in *Stull*, Steven, as the owner of the policy, retained the discretion to make changes to the policy, including the right to remove Pamela Jo as the beneficiary. However, in the eight years between the parties' divorce and Steven's death, he did not make this change.

Further, the Supreme Court of Kentucky recently issued an opinion endorsing the soundness of the appellate court's decision in *Stull*. *See Sadler v. Buskirk*, 478 S.W.3d 379 (Ky. 2015). In *Sadler*, a divorcing couple entered into a separation agreement that stated, "[t]he parties mutually agree to make no claim upon any interest owned by the other, now or in the future, in the current accounts and any life insurance . . . ." *Sadler*, 478 S.W.3d at 383. Upon the husband's death, the ex-wife filed a declaratory action to obtain funds in the husband's Individual Retirement Account ("IRA") to which she remained the named beneficiary. *Id.* The ex-wife argued that her beneficiary expectancy in the IRA was not extinguished by the above clause in the separation agreement, because that clause only addressed the

7

husband's ownership interest in the IRA, as opposed to specifically addressing her beneficiary expectancy. *Id*. at 384. In explaining "the unique nature of the property that is transferred upon the death of the IRA owner and how it differs from the interest of a life insurance beneficiary[,]" the Court stated:

> If the property at stake were the proceeds of a life insurance policy on [the husband's] life, the language used in Paragraph 5 would conceivably support the disposition advocated by [the ex-wife]. That is because Paragraph 5, by its express language, affects *only* interests in property that [the husband] "*owned ... now or in the future.*" It is obvious that the proceeds of a life insurance policy payable at [the husband's] death could never be property that [the husband] owned during his lifetime. Since [the husband] could not have "owned" the proceeds paid on an insurance policy on his own life, and since [the ex-wife's] disclaimer in Paragraph 5 is limited to property "owned by [the husband]," it follows that [the ex-wife's] limited disclaimer could not extend to the life insurance proceeds.

*Id.*

Therefore, because the Separation Agreement here only addressed Decedent's ownership interest in the policy, as opposed to specifically divesting Pamela Jo of her beneficiary expectancy to the proceeds, her right to the proceeds remains intact.

The Estate also argues that nothing in the record suggests Decedent intended for Pamela Jo to receive the Policy proceeds. In doing so, the Estate primarily relies on Larry Strasinger's affidavit testimony that Steven "had no friendly, ongoing

relationship" with Panela Jo after their divorce, but instead "expressed nothing but negative feelings" about her. (Doc. 28, Exh. 1 ¶¶ 22-23).

There is no way of knowing whether these statements are accurate. However, even if true, they do not overcome the fact that Steven chose to leave Pamela Jo as the beneficiary to the Policy for eight years after their divorce. *See Stull*, 2011 WL 4117891, at *3 (stating the husband "was made aware of [his former spouse's] designation as beneficiary on the policy and chose not to alter it"). Thus, contrary to the Estate's assertions, this fact alone appears to be the strongest evidence of Steven's intent: for Pamela Jo to receive the proceeds of the Policy.

Finally, the Estate asks the Court to carve out an exception to this rule. Specifically, the Estate now argues that Steven's motorcycle accident caused him to become mentally disabled to the point that he "lacked the requisites to have clearness of mind, sufficient memory, and understandings of his actions." (Doc. 29 at 7). For support, several statements from Larry Strasinger's affidavit are cited, including that the Steven was unable to work due to his disability, that he "suffered from memory loss", and that he "had limited movement in part of his body." *Id*. Based on the above, the Estate contends that "[a]s a matter of public policy, [Kentucky] law should not assume individuals suffering brain injuries intended for their ex-spouse to receive their entire

9

wealth at the expense of their surviving children." *Id*. Thus, based on this proposed exception, the Estate asks to be awarded the Policy proceeds, or in the very least, that the Court deny summary judgment because there is a genuine issue of material fact with regard to Steven's mental capacity. (Doc. 25 at 10; Doc. 29 at7). The Court does not find this argument to be well taken.

First, as Pamela Jo points out, Steven's medical records indicate that his injuries from the motorcycle accident did not affect his mental capacity. For example, on August 4, 2005, a little over a year after the motorcycle accident and approximately eight months before the divorce, Ralph Huller, M.D. evaluated Steven and found that "[h]is cognitive function and his ability to relate to others appear normal." (Doc. 25 at 74). Moreover, during an evaluation on May 11, 2013, approximately a year and a half before Steven died, Nicole Kershner, M.D. opined that "[h]is ability to speak, listen, reasoning [sic] and socializes [sic] does not appear to be impaired." (Doc. 25 at 148). Thus, the medical record supports the conclusion that Steven was mentally competent during the eight years between his divorce from Pamela Jo and his death. Again, during this time, he chose not to remove Pamela Jo as the beneficiary of the Policy.

The Estate fails to identify any portions of these records that dispute the above findings of Dr. Huller and Dr. Kershner. Larry Strasinger's affidavit testimony that Steven had memory

10

loss, limited movement in part of his body, and received Social Security Disability benefits does not refute the doctors' professional opinions, nor does it support an inference that Steven lacked the mental capacity to make informed life decisions, such as designating the beneficiary of the Policy. *See e.g., Sloan v. Sloan*, 197 S.W.2d 77, 79-81 (Ky. 1946); *Nelson v. Metro. Tower Life Ins. Co.*, 4 F. Supp. 2d 683, 684-86 (E.D. Ky. 1998) (finding that two months before his death, an insured who had terminal cancer was competent to exercise his right to receive accelerated benefits).

Other facts in the record further undermine the Estate's assertions that Steven was mentally incapacitated. First, it was after the accident that Steven and Pamela Jo began their divorce proceedings, during which Steven testified in court. Second, sometime between 2011 and his death, Steven purchased a 2011 Ford Ranger pickup truck. (Doc. 26-5). Third, in November of 2013, Steven purchased a house. (Doc. 26-4 at 1-3). Fourth, Steven died from injuries he sustained in an accident while operating an all-terrain vehicle (ATV). (Doc. 25 at 161).

Further, there can be no colorable argument that Steven was not aware that Pamela Jo remained the policy beneficiary after their divorce. The record shows that Steven received annual statements that listed the policy beneficiaries, Pamela Jo being the primary beneficiary. (Doc. 26-2 at 3-11). Based on these

11

facts, plus the medical record evidence, it cannot be said that Steven was mentally incapacitated such that he could not have removed Pamela Jo as the policy beneficiary if he had so desired. *See e.g.*, *Stull*, 2011 WL 4117891, at *3 ("We must conclude that if [the husband] was lucid enough to appoint a power of attorney, that he was also lucid enough to comprehend the existence of the [life insurance] policy and the consequence of having [his former spouse] as the named beneficiary.").

In sum, under Kentucky law, because the Separation Agreement did not directly address Pamela Jo's beneficiary expectancy with regards to the policy proceeds, it did not divest her of the same. Moreover, the record is devoid of any convincing evidence that Steven had a mental disability that would warrant creating an exception to Kentucky law.

Therefore, having reviewed this matter, and being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) Defendant Larry Strasinger's motion for summary judgment (Doc. 25) be, and is hereby, **DENIED**;

(2) Defendant Pamela Jo Cropenbaker's motion for summary judgment be, and is hereby, **GRANTED**' and

(3) The Clerk of Court is directed to disburse to Defendant Pamela Jo Cropenbaker's counsel the sum currently being held in the registry of the Court pursuant to Doc. 23.

This 19th day of September, 2016.



Signed By:
William O. Bertelsman WOB
United States District Judge